**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| ROBERT GALLAGHER, | ) ) ) |
| Plaintiff | ) ) |
| v. | )   02: 11-cv-1118 |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) ) ) ) |
| Defendant. | ) ) |

**MEMORANDUM OPINION AND ORDER OF COURT**

June 20, 2012

**I.      Introduction**

Plaintiff, Robert Gallagher, brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c), for judicial review of the final determination of the Commissioner of Social Security ("Commissioner") which denied his application for supplemental security income ("SSI") and disability insurance benefits ("DIB") under titles XVI and II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-403; 1381-1383(f).

**II.      Background**

**A.      Facts**

Plaintiff was born on September 12, 1966 (R. 17, 60).  He received his GED and briefly attended college (R. 60).  Plaintiff has past relevant work experience in several occupations, including manager/assistant manager, parcel sorter, and stock person (R. 17, 86).

Plaintiff alleges disability as of October 15, 2008 due to bipolar disorder, anxiety disorder, panic disorder, left knee problem, and asthma (R. 11, 122, 130, 150–151).  The

record reflects that Plaintiff has not engaged in substantial gainful work activity since having alleged disability in October, 2008 (R. 13).

### B. <u>Procedural History</u>

Plaintiff initially filed an application for SSI/DIB on December 11, 2008 in which he claimed total disability beginning October 15, 2008. An administrative hearing was held on July 1, 2010 before Administrative Law Judge Guy Koster ("ALJ") (R. 56). Plaintiff was represented by Barbara S. Manna, a non-attorney Claimant Disability Representative, and testified at the hearing (R. 56-89). Charles M. Cohen, Ph.D, an impartial vocational expert, also testified at the hearing (R. 85-89).

On September 29, 2010 the ALJ rendered an unfavorable decision to Plaintiff in which he found that Plaintiff suffered from severe impairments including bipolar disorder, major depressive disorder, panic disorder, anxiety disorder, asthma, hypertension, and alcohol dependence in remission since July 20, 2009 (R. 14). The ALJ determined that Plaintiff's asthma and hypertension were well-controlled with medication, and his mental impairments were "integrally related to the [Plaintiff's] long history of alcohol dependence" (R. 14). The ALJ concluded that Plaintiff's impairments (1) did not meet or equal one of the listed impairments as defined in 20 C.F.R. Pt. 404, Subpt. P, App. 1, and (2) while Plaintiff did not have the residual functional capacity ("RFC") to return to his previous relevant work, he retained the ability to perform a wide range of medium (packing), light (inspector), or sedentary (assembler) activity, and therefore was not "disabled" within the meaning of the Act (R. 14, 17–18).

The ALJ's decision became the final decision of the Commissioner on June 30, 2011 when the Appeals Council denied Plaintiff's request to review the decision of the ALJ.

On August 30, 2011, Plaintiff filed his Complaint in this Court in which he seeks judicial review of the decision of the ALJ. The parties have filed cross-motions for summary judgment. Plaintiff contends that the ALJ erred in (1) failing to properly weigh Plaintiff's mental health symptoms and incorporate Plaintiff's limitations in determining his RFC as required by SSR 96-8p and SSR 85-15, and (2) failing to give "consideration," "deference," or "appropriate" weight to a Mental RFC Questionnaire completed by Plaintiff's current therapist. *See* Pl's Br. at 4–7. Plaintiff requests that the decision of the ALJ be reversed and that he be awarded DIB and SSI benefits or, in the alternative, that the case be remanded to the Commissioner. Pl's Br. at 7. The Commissioner contends that the decision of the ALJ should be affirmed as it is supported by substantial evidence.

The Court agrees with Plaintiff and will therefore grant in part the motion for summary judgment filed by the Plaintiff, deny the motion for summary judgment filed by the Commissioner, and remand the case for further proceedings.

III.     **Legal Analysis**

A.     **Standard of Review**

The Act limits judicial review of disability claims to the Commissioner's final decision. 42 U.S.C. §§ 405(g), 1383(c)(3). If the Commissioner's finding is supported by substantial evidence, it is conclusive and must be affirmed by the Court. 42 U.S.C. § 405(g);

*Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). The United States Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Capato v. Comm'r of Soc. Sec.*, 631 F.3d 626, 628 (3d Cir. 2010) (internal citation omitted). It consists of more than a scintilla of evidence, but less than a preponderance. *Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 798, 800 (3d Cir. 2010).

In situations where a claimant files concurrent applications for SSI and DIB, courts have consistently addressed the issue of a claimant's disability in terms of meeting a single disability standard under the Act. *See Burns v. Barnhart*, 312 F.3d 113, 119 n.1 (3d Cir. 2002) ("This test [whether a person is disabled for purposes of qualifying for SSI] is the same as that for determining whether a person is disabled for purposes of receiving social security disability benefits [DIB]. *Compare* 20 C.F.R. § 416.920 *with* § 404.1520."); *Sullivan v. Zebley*, 493 U.S. 521, 525 n. 3 (1990) (holding that regulations implementing the Title II [DIB] standard, and those implementing the Title XVI [SSI] standard are the same in all relevant aspects); *Morales v. Apfel*, 225 F.3d 310, 315–16 (3d Cir. 2000) (stating claimants burden of proving disability is the same for both DIB and SSI).

When resolving the issue of whether an adult claimant is or is not disabled, the Commissioner utilizes a five-step sequential evaluation. 20 C.F.R. §§ 404.1520, 416.920 (1995). This process requires the Commissioner to consider, in sequence, whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to his or her past relevant work, and (5) if

not, whether he or she can perform other work. *See id.*; *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 545-46 (3d Cir. 2003) (*quoting Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118-19 (3d Cir. 2000)).

To qualify for disability benefits under the Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him or her from engaging in any substantial gainful activity for a statutory twelve-month period." *Fargnoli v. Halter,* 247 F.2d 34, 38-39 (3d Cir. 2001) (internal citation omitted); 42 U.S.C. § 423 (d)(1) (1982). This may be done in two ways:

(1) by introducing medical evidence that the claimant is disabled per se because he or she suffers from one or more of a number of serious impairments delineated in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *See Heckler v. Campbell*, 461 U.S. 458, 460 (1983); *Newell,* 347 F.3d at 545-46; *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004); or,

(2) in the event that claimant suffers from a less severe impairment, by demonstrating that he or she is nevertheless unable to engage in "any other kind of substantial gainful work which exists in the national economy . . . ." *Campbell,* 461 U.S. at 461 (citing 42 U.S.C. § 423 (d)(2)(A)).

In order to prove disability under the second method, a claimant must first demonstrate the existence of a medically determinable disability that precludes plaintiff from returning to his or her former job. *Newell,* 347 F.3d at 545-46; *Jones,* 364 F.3d at 503. Once it is shown that claimant is unable to resume his or her previous employment, the burden shifts to the Commissioner to prove that, given claimant's mental or physical limitations, age, education

and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Rutherford*, 399 F.3d at 551; *Newell,* 347 F.3d at 546; *Jones*, 364 F.3d at 503; *Burns v. Barnhart*, 312 F.3d 113, 119 (3d Cir. 2002).

When a claimant has multiple impairments which may not individually reach the level of severity necessary to qualify any one impairment for Listed Impairment status, the Commissioner nevertheless must consider all of the impairments in combination to determine whether, collectively, they meet or equal the severity of a Listed Impairment. *Diaz v. Comm'r of Soc. Sec.*, 577 F.2d 500, 502 (3d Cir. 2010); 42 U.S.C. § 423(d)(2)(C) ("in determining an individual's eligibility for benefits, the Secretary shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity").

In this case, the ALJ determined that Plaintiff was not disabled within the meaning of the Act at the fifth and final step of the sequential evaluation process. In making this determination, the ALJ first determined that prior to Plaintiff having successfully refrained from using alcohol on July 20, 2009, his alcohol dependence was material to the issue of disability[1] (R. 14). Second, after Plaintiff effectively stopped his use of alcohol on July 20,

---

1 Congress amended the Social Security Act by the Contract with America Advancement Act of 1996 which bars the award of disability benefits in cases in which alcoholism or drug addiction play a contributing role in the claimant's inability to perform substantial gainful employment. The amendment, codified at 42 U.S.C. § 423(d)(2)(C), states:

An individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled.

Relevant SSA regulations provide that:

(continued…)

2009, the ALJ determined that he retained the RFC to perform a significant number of medium, light, or sedentary jobs in the national economy with restrictions to avoid concentrated exposure to extreme heat/cold/wetness and humidity as well as dust, fumes, odors, gasses and poor ventilation, and to perform only simple, routine, repetitive tasks, with little or no changes in the work setting, and only occasional contact with the general public, coworkers, and supervisors (R. 16).

**B.**    **Discussion**

As set forth in the Act and applicable case law, this Court may not undertake a de novo review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986), *cert. denied*, 482 U.S. 905 (1987). The Court must simply review the findings and conclusions of the ALJ to determine whether they

---

(…continued)

    (1)   The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.

    (2)   In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determining whether any or all of your remaining limitations would be disabling.

        (i)   If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.

        (ii)   If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

20 C.F.R. §§ 404.1535, 416.935

are supported by substantial evidence. 42 U.S.C. § 405(g); *Schaudeck v. Comm'r of Soc. Sec. Admin.,* 181 F.3d 429, 431 (3d Cir. 1999). Because both of Plaintiff's arguments on appeal focus on Plaintiff's mental health limitations, particularly following the date of his sobriety of July 20, 2009, the Court first summarizes Plaintiff's mental health history and treatment as contained in the record.

On November 8, 2008, Plaintiff was admitted to Western Psychiatric Institute and Clinic ("WPIC") for inpatient psychiatric treatment for complaints of anxiety, depression, and suicidal thoughts (R. 215). The initial psychiatric evaluation performed by Jessica Gannon, M.D., detailed that Plaintiff had been "feeling depressed for about one year," and complained of difficulty sleeping, decreased appetite, low energy, difficulty concentrating, crying spells, and feeling worthless and hopeless (R. 215). Dr. Gannon noted Plaintiff's long history of alcohol dependence, and that Plaintiff reported he had stopped drinking ten days prior to presenting at WPIC (R. 215). The mental status examination noted Plaintiff appeared mildly disheveled, tearful, anxious, and depressed, with poor insight and judgment, but also appeared alert, with concentration and memory intact (R. 16). Plaintiff's Global Assessment Functioning ("GAF") score was noted to be 55 (R. 213). He was discharged on November 20, 2008, after having received medication and individual and group therapy (R. 210). At the time of discharge, Plaintiff was alert and cooperative, his mood was good, memory, attention, and concentration were intact, thought form was logical and linear, and insight and judgment were fair (R. 211–212).

Following his discharge from inpatient treatment at WPIC, on November 21, 2008, Plaintiff was evaluated at WPIC for continued outpatient treatment (R. 431–436). The initial evaluation indicated Plaintiff's chief complaints as depression, panic attacks, sleep disturbances, and alcohol dependence (R. 432). Plaintiff stated that his alcohol dependence worsened his depression, and contributed to his isolating behavior (R. 434). His recreational activities included playing guitar, watching television, sports of all types, and spending time with his children (R. 435). Plaintiff reported his alcohol consumption interfered with his recreational time (R. 435). He was noted to be anxious and depressed, but cooperative and friendly (R. 435). Plaintiff's GAF score at the time was 58 (R. 432).

On December 1, 2008, Plaintiff began an Intensive Outpatient Program ("IOP") of group and individual therapy with WPIC (R. 430). At the initial group therapy session on December 1, 2008, Plaintiff discussed his anxiety, and that it often caused him to stay home and not go out in public (R. 430). He was noted to be alert, responsive, and psychiatrically stable (R. 430). On December 5, 2008, the group therapy progress notes state that Plaintiff was "visibly healthier" than the previous week (R. 429). During three group therapy sessions from December 8, 2008, December 10, 2008, and December 12, 2008, Plaintiff was noted to be alert, responsive, and psychiatrically stable (R. 426–428). On December 15, 2008, Plaintiff reported a lot of anxiety, and that he had gone to the emergency room the previous evening because of his anxiety symptoms (R. 424). On December 31, 2008, Plaintiff reported that his anxiety had "been better lately" (R. 421). On January 9, 2009, Plaintiff completed the IOP group, and reported that he was excited to move on (R. 419).

On February 13, 2009, Plaintiff was again evaluated for entrance into IOP through WPIC (R. 453–454).  The evaluation states, in pertinent part,

> Pt reports Panic attacks but the last one was two months ago, sleep is 'terrible', concentration is poor, memory is 'ok', pt isolates in his apt, endorses anhedonia, reports 'slight mania two months ago', low frustration tolerance.  Pt becomes agitated and has little patience for complications, has experienced racing thoughts, irritability, restlessness, little need for sleep during mania.

Plaintiff was placed on a pending list for a particular IOP group, and the record indicates he began IOP with WPIC again in March 2009 as discussed below.

On February 16, 2009, Plaintiff was seen by Nadeem Islam, M.D., his treating physician, for a follow up appointment (R. 501).  Plaintiff noted he still experienced anxiety, but had not seen his psychiatrist for some time (R. 501).  Dr. Islam deferred treatment to Plaintiff's psychiatrist (R. 501).

On February 27, 2009, Plaintiff completed a function report for the Social Security Administration in which he stated his anxiety and panic disorders prevented him from performing "a lot" of daily activities (R. 160), and that he had difficulty sleeping (R. 161).  He also described difficulty concentrating and stated he could only pay attention for "maybe" ten to fifteen minutes (R. 165).  He indicated having taken his medication at the proper times and keeping all doctor appointments (R. 160), no difficulty with personal care (R. 161–162), ability to prepare quick meals once or twice per day, perform household chores and repairs (R. 162), shop for food, clothing, household items and prescriptions (R. 163), chat daily on the computer and by phone (R. 164), and visit his girlfriend on the weekends (R. 164).  Additionally, Plaintiff stated he follows instructions well (R. 165).

Plaintiff attended IOP with group and individual therapy through WPIC in March 2009. At his initial session on March 2, 2009, he stated his father had passed away the previous week, reported his panic attacks were more frequent, and complained of anxiety, racing thoughts, difficulty sleeping, and wanting to isolate in his apartment (R. 418). His mood was depressed, with low energy, poor concentration, and good memory (R. 418). During the next several sessions, Plaintiff continued to complain of anxiety, panic, and difficulty sleeping, and participated in several group therapy sessions lasting from 9:00 AM to 12:00 PM, during which time he was noted to be attentive and cooperative (R. 406–415). On March 30, 2009, Plaintiff reported feeling improved (R. 403). Plaintiff was discharged from WPIC on April 16, 2009 after beginning to miss therapy sessions, and finally indicating to the individual therapist that the present time was "not conducive for treatment for him" (R. 382). Plaintiff's GAF at the time of discharge was noted to be 50 (R. 383).

On March 31, 2009, Plaintiff submitted to a psychological examination performed by Thomas M. Eberle, Ph.D. In the mental status examination, Plaintiff described a history of psychiatric treatment for anxiety, sadness, and panic attacks, and indicated he self-medicated with alcohol (R. 274–275). Dr. Eberle noted Plaintiff's "mild agitation, anxiety, and discomfort in a social situation that is unfamiliar" (R. 275), and stated Plaintiff appeared "frightened" and "scared" (R. 279). However, Plaintiff was alert and oriented, and participated in a relevant, rational, intelligent, and coherent conversation (R. 279). Additionally, Dr. Eberle stated Plaintiff's bipolar disorder diagnosis was "completely inaccurate" (R. 275), and his "memory and intellect appeared to be intact and of above-average capacity" (R. 279). There were "no

indications of impairments in arithmetical reasoning, abstract conceptualization, or short-term memory," although Plaintiff occasionally had difficulty with retention due to his anxiety and inability to focus (R. 280). Based on his examination, Dr. Eberle concluded that while at the time of examination, Plaintiff appeared to be incapable of employment, with continued treatment, there was "every reason to believe" Plaintiff would be able to control his disorders and become employable (R. 281). Plaintiff's GAF was noted to be "approximately 40 to 45" (R. 280).

On April 28, 2009, Emanuel Schnepp, Ph.D., completed a Psychiatric Review Technique Form ("PRT") along with a Mental RFC Assessment based on a review of Plaintiff's evidence file from the Social Security Administration. Dr. Schnepp indicated in the PRT that Plaintiff suffered from Bipolar Disorder under 12.04 Affective Disorders, Panic Disorder with Agoraphobia and Generalized Anxiety Disorder under 12.06 Anxiety-Related Disorders, Obsessive-Compulsive Personality Disorder under 12.08 Personality Disorders, and Alcohol Dependence under 12.09 Substance Addiction Disorders (R. 310–318). He indicated that Plaintiff was mildly limited in restriction of activities of daily living, moderately limited in social functioning and concentration, persistence, or pace, and had no repeated episodes of decompensation pursuant to the "paragraph B" criteria of the listings contained in 20 C.F.R. Pt. 404, Subpt. P, App. 1. Additionally, Dr. Schnepp noted Plaintiff's history of depression, anxiety, and alcohol abuse, and stated that he was independent with all activities of daily living, including driving (R. 322). Finally, Dr. Schnepp opined that Plaintiff alleged "marked problems with memory and concentration, but there was no evidence of cognitive difficulties at the CE.

Indeed, the examiner expressed the opinion that his 'memory and intellect appeared to be intact and of above-average capacity'" (R. 322). On the Mental RFC Assessment, Dr. Schnepp found that Plaintiff was not significantly limited in his ability to remember work-like procedures, and only moderately limited in his ability to maintain attention and concentration for extended periods, maintain regular attendance, work in coordination or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, respond appropriately to changes in the work setting, and travel in unfamiliar places (R. 306–307). Dr. Schnepp further noted that while the RFC assessment partially reflected the report completed by Dr. Eberle, Dr. Eberle's statements regarding Plaintiff's abilities in making occupation, personal, and social adjustments were not consistent with all of the medical and non-medical evidence (R. 308). According to Dr. Schnepp, Dr. Eberle's report represented only a "snapshot of the claimant's functioning" and was an "overestimate of the severity of his limitations" (R. 308).

Plaintiff again participated in IOP with individual and group therapy at WPIC in May 2009 (R. 387–402). At the initial assessment, Plaintiff reported "relentless" anxiety, panic attacks three to four times per week, being depressed, hearing people whisper his name at night, and difficulty sleeping (R. 401). Plaintiff's GAF score was noted to be 45 (R. 402). Plaintiff continued to attend group therapy sessions several times per week from 9:00 AM to 12:00 PM, during which time his participation is consistently noted as "attentive and cooperative" (R. 400, 398, 395, 392, 390, 388). On May 14, 2009, Plaintiff reported he still experienced chronic high

anxiety, and difficulty leaving his home, but once he arrived at WPIC for therapy, "it's fine" (R. 396). On May 18, 2009, Plaintiff noted he had attended a Steelers charity basketball game and "was not affected by crowd," and also "got together with his old band and 'had fun'" (R. 391). On May 21, 2009, Plaintiff reported he was able to sufficiently focus to repair a guitar the previous day (R. 387).

Following a series of hospitalizations for alcohol detoxification in June and July 2009 (R. 14), Plaintiff was admitted to the alcohol recovery program at the Greenbriar Treatment Center on July 27, 2009, seven days after his last use of alcohol (R. 462–463). The initial psychiatric evaluation report completed by Alan Axelson, M.D., indicates that although Plaintiff was anxious and his judgment was impaired, he was appropriately groomed and alert, with logical and focused thought processes (R. 464). Dr. Axelson also noted Plaintiff's mood disorder, but questioned the diagnosis of bipolar disorder, as Plaintiff did not meet all of the criteria (R. 465). During the initial level of care assessment, Plaintiff reported that alcohol worsened his bipolar disorder (R. 466), and that while he still felt depressed, "it's not as bad as it was" (R. 470). Plaintiff's GAF score was noted to be 35 (R. 465).

Plaintiff was released from Greenbriar after eighteen days of treatment (R. 554), and submitted to a psychosocial evaluation at the Western Psychiatric Institute and Clinic ("WPIC") on August 21, 2009 (R. 553–557). Again, Plaintiff reported that "alcohol caused the depression to be worse," and noted that his alcohol abuse contributed to his isolating behavior (R. 554). He also described his recreational activities, including playing the guitar, loving sports, watching television, and spending time with his children (R. 555). Plaintiff reported his

drinking deprived him of his recreational time (R. 555). At the time, his prognosis was "good with recommended treatment and medication management" (R. 557).

At a routine follow-up appointment with Dr. Islam on September 4, 2009, Plaintiff reported he felt "much better" and denied any specific complaints (R. 497). In October and November 2009, Plaintiff again participated in IOP with group therapy and medication management through WPIC (R. 558–569). The group therapy progress notes indicate Plaintiff being very interested in the group, (R. 558–560, 562, 564–565), reporting his mood was good (R. 561, 566), content (R. 567), or positive (R. 569), and states that Plaintiff "appears to be making progress in his recovery" (R. 566).

In March 2010, Plaintiff was referred to Mon Yough Community Services, Inc., ("Mon Yough") for continued follow-up (R. 570). The initial psychiatric evaluation from March 23, 2010, indicates Plaintiff reported symptoms of anxiety and mood swings every few weeks, along with symptoms of OCD and Attention Deficit Disorder with problems staying on track (R. 570). His GAF score was noted to be 48 (R. 571). At a routine check-up with Dr. Islam the following day on March 24, 2010, Plaintiff noted he was having difficulty getting his psychiatric medications filled (R. 544). Dr. Islam involved a health plan liaison to assist Plaintiff in obtaining his medication (R. 545). A subsequent behavioral health medical progress report from Mon Yough dated April 27, 2010, indicates that while Plaintiff continued to have "some" difficulty sleeping due to feeling "alert" and "manicky" [sic] at night, he denied depression and his mood was noted to be stable (R. 574). Plaintiff's mental status examination at that time indicated that his appearance, orientation, affect/mood, impulse control, speech,

judgment/insight, thought process, and thought content were all within normal limits (R. 574). Plaintiff's GAF score was noted to be 45 (R. 574). Similarly, while Plaintiff's next progress report from Mon Yough, dated June 1, 2010, indicates that he was "mildly anxious" and "fidgety," it also states that Plaintiff reported he was doing well on his medication, and that the medication had helped his focus and concentration (R. 572). Again, Plaintiff denied depression, mood swings and irritability, and the remainder of his mental status examination was within normal limits (R. 572). Plaintiff's GAF score was noted to be 45 (R. 572).

On June 16, 2010, Plaintiff's current therapist, Beth Dougherty MSCP, completed a Mental RFC Questionnaire, in which she noted that she saw Plaintiff every 1-2 weeks and that he spent nine hours per week in group therapy (R. 549). She indicated his GAF score to be 45, and stated "[Plaintiff] is progressing appropriately" (R. 549). The assessment requests, inter alia, that the therapist identify Plaintiff's mental impairments by checkmarks next to listed impairments in a chart, and rate Plaintiff's ability to perform work-related activities on a scale of "Unlimited or Very Good" to "No useful ability to function" (R. 549–552). Plaintiff's therapist noted that Plaintiff would be unable to meet competitive standards in his abilities to: remember work-like procedures, maintain attention for two hour segments, maintain regular attendance and be punctual within customary, usually strict tolerances, work in coordination with or proximity to others without being unduly distracted, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, respond appropriately to

changes in routine work setting, deal with stress of semiskilled and skilled work, and travel in unfamiliar places (R. 549–552).

During his administrative hearing on July 1, 2010, Plaintiff testified that the primary issues which prevented him from working were his mental health issues (R. 70). Plaintiff stated "I don't do quite well in crisis situations anymore, or big pressure situations" (R. 67). He indicated having suffered from bipolar disorder and depression (R. 67). Plaintiff testified that he experienced anxiety "several times a week," and while he did not suffer from panic attacks as much as anxiety, he experienced panic attacks "a couple of times a week" (R. 78). He also indicated his panic attacks are "a lot more moderate than they used to be," and that the panic attacks "used to be pretty severe" (R. 79). Plaintiff described his daily activities to include cutting the grass, cooking, going to the store when needed, talking to his daughter and trying to "get down to see them once in awhile," playing guitar, and watching television (R. 76–77). He stated he was unable to read due to poor concentration (R. 77). Plaintiff stated he was able to drive (R. 60). Plaintiff also testified regarding his history of alcohol abuse, stated his clean date as July 20, 2009, and that he attends Alcoholics Anonymous ("AA") meetings 3-4 nights per week at different locations (R. 81–84).

1. *Substantial evidence does not support the ALJ's determination due to a failure to reconcile Plaintiff's low GAF scores with his determination of non-disability.*

Plaintiff first argues that although the ALJ determined that Plaintiff suffered from severe impairments including "bipolar disorder, major depressive disorder, panic disorder, anxiety disorder, asthma, hypertension and alcohol dependence in remission since July 20,

2009" (R. 13), the ALJ failed to include Plaintiff's documented limitations in the RFC following Plaintiff's sober date of July 20, 2009 in accordance with SSR 96-8p and SSR 85-15[2]. *See* Pl.'s Br. at 6.

SSR 96-8p provides that a claimant's "RFC assessment must be based on ***all*** of the relevant evidence in the case record[.]" (emphasis in original); *see also* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). Additionally, "in assessing a claimant's mental RFC, the ALJ must identify the claimant's functional limitations and restrictions, and assess his remaining capacity for work-related mental activities, including "the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." SSR 96-8p. According to SSR 85-15, "a substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base." *See also* 20 C.F.R. §§ 404.1545(c), 416.945(c).

In his decision, the ALJ determined that Plaintiff suffered from bipolar disorder, major depressive disorder, panic disorder, anxiety disorder, asthma, hypertension, and alcohol dependence in remission since July 20, 2009 (R. 13). Although these impairments were deemed to be "severe" within the meaning of 20 C.F.R. §§ 404.1520(c) 416.920(c), the ALJ found that they did not meet or medically equal an impairment listed in 20 C.F.R. Part 404,

---

2 The SSA interprets the statutes it administers and its own regulations through Social Security Rulings ("SSR"). *Newell v. Commissioner of Social Security*, 347 F.3d 541, 546 n. 4 (3d Cir. 2003). Although the SSR's do not have the force of law, they are binding on all components of the SSA once published. *Id.*

Subpart P, Appendix 1 (the "Listing of Impairments" or, with respect to a single impairment, a "Listed Impairment" or "Listing") (R. 14).

In accordance with 20 C.F.R. §§ 404.1545 and 416.945, the ALJ assessed Plaintiff's mental RFC, and determined that after Plaintiff stopped drinking on July 20, 2009, he retained the RFC to perform work at any exertional level, but limited Plaintiff to work which involves: "only simple, routine, repetitive tasks, with little or no changes in the work setting, and only occasional contact with the general public, coworkers and supervisors" (R. 16).  In so determining, the ALJ notes that he gave weight to the "actual records detailing the claimant's improving mental state with no more than mild panic attacks and depressed affect since he has successfully refrained from using alcohol" (R. 16).  According to the ALJ, these "actual treatment notes" also show that Plaintiff was doing well on his current medications (R. 16).

In his brief, Plaintiff contends he was "repeatedly diagnosed with a [GAF] score of '45[,]'' which "clearly" shows the severity of his symptoms.  *See* Pl. Br. at 6.  A review of the record indicates the Plaintiff was assessed the following GAF scores:

- November 8, 2008:    GAF 55    (WPIC) (R. 213)
- November 21, 2008:   GAF 58    (WPIC) (R. 432)
- March 31, 2009:      GAF 40-45 (Dr. Eberle) (R. 280)
- April 16, 2009:      GAF 50    (WPIC) (R. 383)
- May 6, 2009:         GAF 45    (WPIC) (R. 402)
- July 27, 2009:       GAF 35    (Greenbriar) (R. 465)

19

- March 23, 2010:　　GAF 48　　(Mon Yough) (R. 571)
- April 27, 2010:　　GAF 45　　(Mon Yough) (R. 574)
- June 1, 2010:　　GAF 45　　(Mon Yough) (R. 572)
- June 16, 2010:　　GAF 45　　(Beth Dougherty MSCP) (R. 549)

The GAF scale assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest[3]. *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM–IV–TR) 34 (4th ed. 2000); *Bracciodieta-Nelson v. Comm'r of Soc. Sec.*, 782 F. Supp. 2d 152, 157 (W.D. Pa. 2011). GAF scores "are used by mental health clinicians and doctors to rate the social, occupational and psychological functioning of adults." *Irizarry v. Barnhart*, 223 Fed. Appx. 189, 190 n. 1 (3d Cir. 2007); *see also* 65 F.R. 50746-01, 50764-65. While a claimant's GAF score is not generally considered to have a "direct correlation to the severity requirements of the . . . mental disorder listings," it remains the scale used by mental health professionals to "assess current treatment needs and provide a prognosis." *Sweeney v. Comm'r of Soc. Sec.*, No. 10-253-E, 2012 WL 749376 at *4 (W.D. Pa. March 7, 2012) (quoting 65 F.R. 50746-01, 50764-65). As such, "it constitutes medical evidence accepted and relied upon by a medical

---

3 An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood"; of 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., ... suicidal preoccupation)" or "inability to function in almost all areas ...; of 20 [s]ome danger of hurting self or others ... or occasionally fails to maintain minimal personal hygiene ... or gross impairment in communication...." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM–IV–TR) 34 (4th ed. 2000); *Bracciodieta-Nelson*, 782 F. Supp. 2d 152, 157 (W.D. Pa. 2011).

source and *must* be addressed by an ALJ in making a determination regarding a claimant's disability." *Watson v. Astrue,* No. 08-1858, 2009 WL 678717 at *5 (E.D. Pa. March 13, 2009) (emphasis in original) (*citing Colon v. Barnhart,* 424 F.Supp.2d 805, 812 (E.D. Pa. 2006)). While the ALJ is free to accept some parts of the medical evidence and reject others, he must consider all evidence and provide an explanation for discounting rejected evidence, particularly when that evidence would suggest a contrary disposition. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994).

The United States Court of Appeals for the Third Circuit has not specifically addressed whether an ALJ's failure to discuss, at all, numerous GAF scores contained in the record is reversible error; however, it has issued three non-precedential opinions which each discussed the applicability of a claimant's GAF score to the disability analysis. *See Rios v. Comm'r of Soc. Sec.*, 444 F. Appx. 532 (3d Cir. 2011); *Gilroy v. Astrue*, 351 Fed. Appx. 714 (3d Cir. 2009); *Irizarry v. Barnhart*, 233 Fed. Appx. 189 (3d Cir. 2007).

In *Rios*, the record indicated that the plaintiff was assessed three GAF scores at different times of 50, 50, and 50-55 respectively. 444 Fed. Appx. at 534–535. The ALJ failed to address the first two GAF scores of 50, but did make specific reference to the third. *Id.* at 535. The Court of Appeals for the Third Circuit held that remand was not warranted as the ALJ had not ignored medical evidence that contradicted her finding. *Id.* Rather, the ALJ "used a score that not only reflects Rios's therapist's and doctors' notes that his symptoms ranged from moderate to severe, but that also aligns with her overall judgment that his [RFC] was limited by his impairment." *Id.* In contrast, in *Irizarry*, the appellate court noted that the

ALJ's failure to discuss low GAF scores was error even though he had included another higher

GAF score in his determination. 223 Fed. Appx. at 192. The court of appeals found that the

ALJ's omission violated *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981), as it resulted in

the ALJ not explaining his rejection of documented medical evidence. *Id.*

Additionally, in *Gilroy*, the only GAF score contained in the record was found in

one report, of several, completed by the plaintiff's treating psychiatrist. 351 Fed. Appx. at 715.

While the ALJ made repeated references to observations contained in the psychiatrist's report,

he did not specifically reference the "one-time" GAF score of 45. *Id.* at 716. The Court held

that failure to specifically address the single GAF score was not error, as the psychiatrist had

not expressed any opinions regarding Plaintiff's specific limitations nor explained the basis for

the score, and the ALJ made "repeated references" to observations from the psychiatrist's

report. *Id.*

However, the vast majority of Pennsylvania district courts that have addressed this

issue have held that an ALJ's failure to specifically discuss a claimant's low GAF scores in his

determination of disability is cause for remand. *See e.g, Metz v. Astrue*, No. 10-383, 2010 WL

3719075 at*14 (W.D. Pa. Sept. 17, 2010) (ALJ's determination not supported by substantial

evidence where ALJ "did not mention any GAF scores at all and provided no rationale for

rejection of this evidence"); *Wiggers v. Astrue*, No. 09-86, 2010 WL 1904015 at *8 (W.D. Pa.

May 10, 2010) (GAF scores constitute acceptable medical evidence that must be addressed by

an ALJ in making a determination regarding a claimant's disability); *see also Pounds v. Astrue,*

772 F. Supp.2d 713, 726 (W.D. Pa. 2011); *Bonani v. Astrue*, No. 10-0329, 2010 WL 5481551

(W.D. Pa. Oct. 15, 2010) *report and recommendation adopted,* No. 10-329, 2011 WL 9816 (W.D. Pa. Jan. 3, 2011); *Lust v. Comm'r of Soc. Sec.,* No. 10-261, 2010 WL 2773205 at *5 (W.D. Pa. July 13, 2010); *Burkett v. Astrue,* No. 09-26, 2010 WL 724509 at *9 (W.D. Pa. Feb. 26, 2010); *Dougherty v. Barnhart,* No. 05-5383, 2006 WL 2433792 at *10 (E.D. Pa. Aug. 21, 2006); *Span v. Barnhart,* No. 02–7399, 2004 WL 1535768, at *4, *6, *7 (E.D. Pa. May 21, 2004).

Moreover, the instant case is readily distinguishable from both *Rios* and *Gilroy*. Here, the record contains ten GAF scores ranging from 35–58 (R. 213, 432, 280, 383, 402, 465, 571, 574, 572, 549), with seven of these scores below 50 (R. 280, 402, 465, 571, 574, 572, 549). Significantly, five GAF scores are documented after Plaintiff's date of sobriety (July 20, 2009), all of which are below 50 (R. 465, 571, 574, 572, 549). Unlike *Rios*, the ALJ in the present case did not discuss certain GAF scores and disregard others; rather, the ALJ proceeded in his discussion "as if no GAF scores existed in the record at all." *See Sweeney*, 2012 WL 749379 at *6. Notably, the GAF scores below 50 are indicative of "[s]erious symptoms" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)", *see American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM–IV–TR) 34 (4th ed. 2000), which is direct contravention to the ALJ's assertion that the treatment notes in the record following July 20, 2009 documented Plaintiff's improving mental state. Additionally, unlike *Gilroy*, the ALJ did not merely fail to discuss a "one-time" GAF score, but completely omitted the five pertinent GAF scores below 50 post-July 20, 2009 from his analysis. Furthermore, in the instant case, the ALJ's opinion

did not make "repeated references" to any observations in Plaintiff's treatment notes; rather, it merely glosses over the treatment Plaintiff received after July 20, 2009 without a thorough discussion, and also fails to reconcile Plaintiff's low GAF scores reflected in those same records with his conclusion that the records document Plaintiff's improving mental state.

These omissions by the ALJ do "not permit a meaningful review of his decision." *See LaSall v. Comm'r of Soc. Sec.*, No. 10-1096, 2011 WL 1456166 at *6 (W.D. Pa. Apr. 14, 2011). "The ALJ must provide 'not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected.'" *Metz*, 2010 WL 3719075 at *14 (quoting *Cotter v. Harris,* 642 F.2d 700, 705 (3d Cir. 1981)). Additionally, while it has been held that "failure to mention [GAF] scores specifically does not constitute reversible error" where the ALJ conducts a thorough analysis of the medical evidence regarding plaintiff's mental impairments, *see Coy v. Astrue*, No. 08-1372, 2009 WL 2043491 (W.D. Pa. July 8, 2009), absent this analysis, this Court is unable to determine whether the ALJ properly discredited the GAF scores or simply ignored them. *See Metz,* 2010 WL 3719075 at *14.

The ALJ failed to discuss and reconcile Plaintiff's low GAF scores from after July 20, 2009 with his determination of non-disability. Additionally, the opinion fails to thoroughly analyze the "actual treatment notes" relied upon in making the determination. The Court, therefore, finds that the decision of the ALJ is not supported by substantial evidence. Thus, the case must be remanded to the Commissioner for clarification of the ALJ's reasoning and further consideration.

2. *The ALJ properly weighed the Mental RFC Questionnaire completed by Plaintiff's current therapist.*

Plaintiff also argues that the ALJ erred in applying inappropriate weight to the Mental RFC Questionnaire completed by Plaintiff's current therapist, Beth Dougherty MSCP. Specifically, Plaintiff concedes that the therapist's opinion should not be given controlling weight, but argues that the therapist's opinion may be given "consideration and deference." *See* Pl.'s Br. at 7. The Court finds that the ALJ properly considered and appropriately weighed the Mental RFC Questionnaire completed by Plaintiff's current therapist in accordance with 20 C.F.R. §§ 404.1513(d)(1) and 416.913(d)(1).

Therapists are not included in the list of "acceptable medical sources" that are entitled to controlling weight. *See* 20 C.F.R. §§ 404.1513(a), 416.913(a); *Hartranft v. Apfel*, 181 F.3d 358, 361 (3d Cir. 1999). Nonetheless, evidence from a therapist showing the severity of the claimant's impairment and its effect on the claimant's ability to work may be considered. 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1). Additionally, the Court of Appeals for the Third Circuit has consistently held that the Commissioner must "explicitly" weigh all relevant, probative and available evidence. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994); *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir. 1979); *see also Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986); *Cotter v. Harris*, 642 F.2d 700, 705, *rehearing denied*, 650 F.2d 481 (1981). In rendering a decision, "[t]he [Commissioner] must provide some explanation for a rejection of probative evidence which would suggest a contrary disposition." *Adorno*, 40 F.3d at 48. "The [Commissioner] may properly accept some parts of the . . . evidence and reject other parts, but she must consider all the evidence and give some reason for discounting the

evidence she rejects." *Id.* (medical evidence); *see also Burnett v. Commissioner*, 220 F.3d 112, 121-23 (3d Cir. 2000) (non-medical evidence). Failure to properly consider probative evidence is cause for remand. *See e.g. Burnett*, 200 F.3d at 121–23*; Fargnoli v. Massanari*, 247 F.3d 34, 42-44 (3d Cir. 2001).

Furthermore, SSR 06-03p provides that "it may be appropriate to give more weight to the opinion of a medical source who is not an 'acceptable medical source' if he or she has seen the individual more often than the treating source *and has provided better supporting evidence and a better explanation for his or her opinion*." SSR 06-03p (emphasis added). However, where form reports "are unaccompanied by thorough written reports, their reliability is suspect[.]" *Brewster*, 786 F.2d at 585.

The ALJ's decision clearly reflects his consideration of the opinion of Plaintiff's therapist. The decision of the ALJ states, in relevant part, as follows:

> Although the claimant's current therapist completed a mental abilities assessment form indicating the claimant was unable to meet competitive standards in many areas of functioning (Exhibit 44F), I have given little weight to the assessment. The form was not completed by an approved medical source, and appears to be an exaggeration of the claimant's functional limitations. The actual treatment notes continue to show the claimant doing well on his current medication and having only mild or occasional symptoms (Exhibit 48F).

(R. 16). The Mental RFC Assessment completed by Plaintiff's current therapist is unaccompanied by additional supporting evidence from the therapist or an explanation for her opinion. As a thorough written report is not provided with the form assessment, its reliability is suspect. See *Brewster*, 786 F.2d at 585.

Thus, the Court finds that the ALJ applied the proper legal standards in evaluating the opinions of those who treated and examined Plaintiff, and in applying little weight to the Mental RFC Assessment completed by Plaintiff's current therapist.

## IV.    Conclusion

When reviewing a decision of the Commissioner to deny disability benefits, it is not the Court's function to substitute its judgment for that of the Commissioner.  The Commissioner's decision in the present case may ultimately be correct and nothing in this Memorandum Opinion should be taken to suggest that the Court has presently concluded otherwise.  However, in the absence of sufficient indication that the Commissioner considered all of the evidence in the case and applied the correct legal standards, the Court cannot satisfy its obligation to determine whether or not the Commissioner's decision was supported by substantial evidence.  Accordingly, this case will be remanded to the Commissioner to further develop the record in accordance with this Memorandum Opinion.

For these reasons, the Court will grant in part the Motion for Summary Judgment filed by the Plaintiff, deny the Motion for Summary Judgment filed by the Commissioner, and remand this case for further proceedings.

An appropriate Order follows.


McVerry, J.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| ROBERT GALLAGHER, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 02: 11- cv-1118 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER OF COURT

**AND NOW**, this 20th day of June 2012, in accordance with the foregoing

Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED, AND DECREED** that:

1.    The Motion for Summary Judgment (Document No. 13) filed by Michael J.

Astrue, Commissioner of Social Security is **DENIED**;

2.    The Motion for Summary Judgment (Document No. 15) filed by Plaintiff,

Robert Gallagher, is **GRANTED IN PART AND DENIED IN PART**;

3.    This case is **REMANDED** for reconsideration, rehearing, and/or further

proceedings consistent with this opinion; and

3.    The Clerk will docket this case closed.

BY THE COURT:

s/Terrence F. McVerry
United States District Court Judge

28

cc:     Kelie C. Schneider, Esquire
       Berger and Green, P.C.
       Email: kschneider@bergerandgreen.com

       Albert Schollaert,
       Assistant United States Attorney
       Email: albert.schollaert@usdoj.gov